**HEIDTMAN STEEL PRODUCTS, INC., Plaintiff,**

v.

**COMPUWARE CORPORATION, Defendant.**

No. 3:97CV7389.

United States District Court, N.D. Ohio, Western Division.

Aug. 13, 2001.

Clyde H. Wilson, Wilson, Johnson & Jaffer, Sarasota, FL, John M. Carey, Kimberly S. Kondalski, Robert W. Bohmer, Watkins, Bates & Carey, Toledo, OH, Mark C. Schaffer, Emch, Schaffer, Schaub & Porcello, Toledo, OH, for Heidtman Steel Products, Inc.

Anthony J. Rusciano, George M. Head, Plunkett & Cooney, Bloomfield Hills, MI, Joseph V. Walker, Plunkett & Cooney, Detroit, MI, Michael G. Sanderson, Shumaker, Loop & Kendrick, Toledo, OH, for Compuware Corporation.

## ORDER

CARR, District Judge

This case involves a dispute over the installation of a computer system by defendant Compuware Corporation ("Compuware") for plaintiff Heidtman Steel Products, Inc. ("Heidtman"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Pending is Compuware's motion for summary judgment on Heidtman's rescission and fraud claims. (Doc. 168). For the following reasons, Compuware's motion for summary judgment is denied in part and granted in part.

## BACKGROUND

Heidtman is a Toledo-based company in the business of purchasing flat rolled steel coils for processing and resale. In the early 1990s, Heidtman determined that its computer system needed replacement and launched an initiative called the "Plus Project," the goal of which was to install a new, modern computer system, based on an Oracle platform.

Heidtman enlisted the help of several software consultants, including Compuware, to work under the direction of Ernst & Young, an accounting firm that Heidtman anticipated would oversee the Plus Project. In connection with Compuware's hiring, Compuware and Heidtman entered into a contract titled the "Agreement for Technical Personnel Services" ("service agreement"). According to the service agreement, Compuware was to provide computer programming expertise, analysis, coding and related services. The service agreement also set forth the terms and conditions of Compuware's employment, including provisions controlling 1) termination, 2) compensation, 3) payment of bills and expenses, 4) assignment of work, 5) liability, 6) limitations on warranties and remedies, 7) modification, and 8) choice of law.

After the service agreement was executed, Ernst & Young pulled out of the Plus Project. As a consequence, Compuware's role changed. These changes were memorialized in a series of agreements, called phase agreements, drafted by Compuware at the outset of each phase of work. In total, four phase agreements were written; the third, however was not signed by Heidtman. The purpose of the phase agreements was to define the next segment of work to be performed by Compuware and to obtain Heidtman's consent before starting. Though the phase agreements contain detail about the tasks Compuware proposed to undertake and the key deliverables, they do not independently set forth any new terms and conditions.

In 1997, Heidtman and Compuware began to clash over the progress of the Plus Project. Heidtman was distressed that the launch of the new computer system had, in its view, been delayed, and that Compuware had exceeded the Plus Project's budget. Compuware allegedly was troubled because Heidtman had not paid approximately $2,824,875 of past due fees. Unable to resolve their differences, the parties' relationship ended in late April 1997.

On May 9, 1997, Heidtman filed this suit, alleging breach of contract and other state law claims. Subsequent to this filing, Heidtman retained Ernst & Young to audit the work done by Compuware. In its audit, Ernst & Young concluded that Compuware had so poorly managed the Plus Project that none of Compuware's work product was salvageable. Further, Ernst & Young informed Heidtman that it would have to design a new computer system from scratch, and that the money it had paid to Compuware had been a complete waste.

In late 1998, according to Heidtman, it commissioned an independent computer consulting firm, Stonebridge Technologies, to review Ernst & Young's findings. According to Heidtman, Stonebridge Technologies, at the conclusion of its investigations, likewise determined that Compuware was at fault for the Plus Projects' failure.

On February 15, 2000, I granted part of Compuware's first motion for summary judgment, ruling that 1) the phase agreements and service agreement must be read together as a single contract; 2) the contract contemplated the provision of services thereby precluding the application of the UCC; 3) Heidtman's negligence, professional malpractice, and breach of implied duty of good faith claims should be

summarily dismissed; and 4) Heidtman's promissory estoppel claim was barred because a contract existed between the parties. (Doc. 131). I also held that genuine issues of fact existed as to 1) Heidtman's breach of contract claim based on Compuware's failure to deliver an operable computer system; 2) whether Heidtman accepted performance thereby precluding its claim for rescission or damages; and 3) Heidtman's conversion and replevin claims. (*Id.*). Further, I held that Michigan law applied to the action. (*Id.*).

On April 10, 2000, after additional briefing by the parties, I held that 1) the service agreement's limitation on remedies was valid and enforceable; and 2) Compuware validly excluded any warranties not set forth in the service and phase agreements. (Doc. 143).

Finally, I clarified in a subsequent order that 1) after holding the UCC did not apply, Heidtman was not restricted from pursuing a rescission claim under Michigan common law; and 2) the limitation clause for damages did not prohibit a rescission claim. (Doc. 166).

## ANALYSIS

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the ab-

sence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleading or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### A. Rescission

■ Heidtman seeks rescission of the contract alleging that Compuware's installation of the computer system was a failure. (Doc. 144). Compuware moves for summary judgment alleging that: 1) Heidtman failed to perform its obligations under the contract, thus precluding its rescission action; and 2) Heidtman's delay in bringing the rescission claim amounts to a waiver. (Doc. 168).[1]

---

1. In my earlier opinions, I held that Heidtman's allegations, if proven true, could amount to a valid rescission claim. (Doc. 131 at 19; Doc. 143 at 3). Based on this holding, Heidtman argues Compuware's motion for summary judgment should be treated as a motion for reconsideration. (Doc. 181 at 39). I disagree. A holding that Heidtman's allegations state a claim for rescission does not preclude Compuware from challenging the merits of such claim in a later motion.

■ To warrant rescission of a contract, there must be a material breach affecting an essential part of the contract. *Holtzlander v. Brownell*, 182 Mich.App. 716, 721, 453 N.W.2d 295 (1990). Whether a breach is material is a question of fact. *Werner Gommeringer v. Amway Corp.*, No. G85–832, 1988 U.S. Dist. LEXIS 17824, *6, (W.D.Mich.1988) (unpublished) (*citing Pratt v. Van Rensselaer*, 235 Mich. 633, 209 N.W. 807 (1926)).

■ A party is not entitled to rescind a contract if that party has not fulfilled its obligations under the contract. *Miller v. Smith*, 276 Mich. 372, 267 N.W. 862 (1936). Compuware alleges that Heidtman may not bring a rescission action because: 1) Heidtman refused to pay Compuware for the last eight months of work performed; 2) Jim Hill, Heidtman Project Director for Plus Project, failed to perform his full-time position of managing project and prevent "scope creep"[2]; and 3) Oracle employees hired by Heidtman did not perform their duties properly. I find that Heidtman has established genuine issues of material fact regarding its performance of the contract. Compuware's motion for summary judgment is, therefore, denied as to the rescission claim.

### Heidtman's Alleged Failure to Pay

■ Both parties agree that, under the contract, Compuware was to be paid on a time and materials basis. Compuware created budgets and timelines for completion of the project and submitted them to Heidtman.

According to Compuware, Heidtman wrongfully refused to pay for the last eight months of work that Compuware performed. (Doc. 168 at Ex. I, J, and K). By entering into a time and materials contract, Compuware argues, Heidtman undertook the risk that the cost of the project would exceed the estimated budgets. Heidtman was still obligated to pay Compuware even if the amount was in excess of the budget. Compuware argues that Heidtman's refusal to pay prevents it from bringing its rescission claim.

Heidtman argues that it properly refused to pay Compuware because the amount billed was in excess of the agreed budget.[3] According to Heidtman, it refused to pay after Compuware failed to provide a satisfactory explanation for the unauthorized overrun. (Doc. 187 at Ex. AA, EE; Ridenour 2 Dep. at 112–114).

Whether Heidtman was obligated to pay Compuware, despite the cost over budget, depends on the agreement between Heidtman and Compuware. The parties' intended obligations arising under the contract is a question of fact. *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127, 517 N.W.2d 19 (1994). As such, I cannot hold as a matter of law that Heidtman failed to perform its obligations under the contract by refusing to pay invoices that allegedly exceeded the original budget.

### Involvement of Jim Hill in Plus Project

■ Compuware argues that Jim Hill failed to perform his obligations to the Plus Project as demanded by the phase

---

**2.** When the projected scope of a project grows substantially, such growth is known as "scope creep".

**3.** Compuware points out that Heidtman argued, in an earlier motion, that its breach of contract claim was based on Compuware's failure to provide a working computer system, and was not based on the allegation that Compuware went over budget. (Doc. 189 at

4). Compuware suggests that Heidtman is now precluded from arguing that it had no obligation under the agreement to pay the excess charges. This claim is without merit. Heidtman's clarification of the basis for its breach of contract claim does not prevent it from responding, in this motion, to the allegation that it wrongfully withheld payments during the last eight months of the contract.

agreements. (Doc. 174 at Ex. E, 3). In addition, Compuware contends Hill was to have managed the scope of the project, but failed to keep the project within its original limits. (Hill Dep., Vol. I at 121–122). Compuware alleges that Hill's failure to perform his contractual duties precludes Heidtman from bringing the rescission claim.

Heidtman argues that both parties agreed Hill would perform his duties as information system director "as needed" and that Hill always had duties outside of the Plus Project. (Doc. 181 at 42). Hill's position and duties, Heidtman contends, were a "staffing projection" and not a binding provision leading to a material breach. (*Id.* at 41–42). Further, Heidtman alleges that the problems of keeping the project within its projected scope were attributable to Compuware's original deficient performance on the project, instead of Hill's lack of oversight. (*Id.* at 44).

Heidtman has produced genuine issues of material fact concerning whether Hill's performance constitutes a breach of Heidtman's contractual obligation. The parties' understanding as to Hill's responsibilities, Hill's actual performance, and Hill's ability to manage the scope of the project are questions of fact, precluding summary judgment on Heidtman's rescission claim.

### Performance of Oracle Employees

■ Heidtman hired Oracle employees to assist in the development of the Plus Project. Compuware argues that the Oracle employees failed adequately to capture Heidtman's business requirements, which were the basis for the overall software development. (Doc. 174 at Ex. E). The parties disagree about the extent of participation by the Oracle employees in the Plus Project and about which party should bear the responsibility for their alleged nonperformance. (Doc. 181 at 47; Doc. 168 at 20). Compuware suggests that, because Heidtman's own employees breached

their obligations on the project, Heidtman cannot seek rescission of the entire contract.

Significant factual questions remain about the control and responsibility over Oracle employees, their performance, and the relationship of this performance to the failure of the project. Summary judgment is, therefore, inappropriate.

### Heidtman's Alleged Delay in Seeking Rescission

■ A plaintiff asserting a right to rescind must do so "without unnecessary delay" or else loses the right to relief. *Wall v. Zynda,* 283 Mich. 260, 265, 278 N.W. 66 (1938). Compuware argues that, although Heidtman brought the rescission claim in December, 1997, Heidtman had knowledge of the breaches on which it bases its claim prior to that time. Specifically, Compuware contends that Heidtman received a memo on June 6, 1995, discussing the same programming, designing and management problems that are the basis for the recission claim. (Doc. 168 at 24). Further, Compuware argues that it informed Heidtman of budget and report problems on several occasions, as early as 1995.

In addition, Compuware alleges that because Heidtman did not make payments as of October, 1996, it should not be able to seek rescission as of December, 1997, when it filed this suit.

Heidtman alleges that, although it had knowledge of earlier problems, it did not realize their depth until receiving the Ernst & Young audit results shortly before filing suit. Further, Heidtman contends that its failure to pay in 1996 was based on Compuware's expenses over the budget, and is independent from the rescission claim. I agree.

In light of all the evidence, I cannot hold, as a matter of law, that Heidtman

had sufficient knowledge to establish a material breach by Compuware at an earlier period, justifying a holding that Heidtman waived its rescission claim. The evidence is conflicting as to whether Heidtman earlier had enough knowledge about the seriousness of Compuware's concerns to find waiver on its part. See *Werner*, 1988 U.S. Dist. at *6 (question of whether a breach is material is a question of fact).

In addition, Heidtman's decision to cease payments in 1996 does not preclude its rescission claim filed in 1997. As discussed above, Heidtman withheld payments until Compuware accounted for the payments over budget. This decision does not independently demonstrate that Heidtman had knowledge that Compuware's performance was so insufficient as to constitute a material breach.

### B. Fraud

 Heidtman alleges that Compuware fraudulently concealed its knowledge that the Plus Project was progressing poorly, Compuware was unable to finish each project phase within the boundaries of the agreement, and Compuware fraudulently represented the status of the project and its costs throughout the various phase agreements. (Doc. 144 at 26–42). Compuware moves for summary judgment arguing that: 1) the economic loss doctrine prevents recovery for the fraud claim; and 2) Heidtman's tort claim must fail because it is based solely on Compuware's contractual duty. I find that the economic loss doctrine, under Michigan law, does not apply outside the UCC context. However, because Heidtman has not presented facts establishing Compuware's breach of duty beyond its contractual duty, Compuware's motion for summary judgment is granted as to the fraud claim.[4]

### Economic Loss Doctrine Does Not Apply to Services Contract

Compuware argues that Heidtman's fraud claim is barred by the economic loss doctrine. I find that the doctrine does not apply to this case because the contract at issue is not governed by the UCC.

In *Neibarger v. Alfa–Laval Inc.*, 439 Mich. 512, 520, 486 N.W.2d 612 (1992), the Supreme Court of Michigan recognized the economic loss doctrine, which provides that "[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has only suffered 'economic' losses."

The court relied heavily on the commercial nature of the contract in its application of the doctrine, noting "[r]ejection of the economic loss doctrine would, in effect, create a remedy not contemplated by the Legislature when it adopted the UCC by permitting a potentially large recovery in tort for what may be a minor defect in quality." *Id.* at 528, 486 N.W.2d 612.

A Michigan Court of Appeals arguably broadened the *Neibarger* decision by stating, in dicta, that the economic loss doctrine is applicable to transactions involving a services contract outside the scope of the UCC. In *Huron Tool and Eng'g Co. v. Precision Consulting Serv., Inc.*, 209 Mich. App. 365, 374, 532 N.W.2d 541 (1995), the court stated that "[a]lthough the Supreme Court's discussion of the economic loss doctrine in *Neibarger* was linked closely to the UCC context of the case, the doctrine is not limited to the UCC."

The Supreme Court of Michigan, however, has not explicitly adopted a broader application of the economic loss doctrine to contracts not governed by the UCC.[5]

---

4. Because Heidtman has not alleged facts demonstrating tortious conduct independent of the contractual duty, I will not discuss Compuware's argument that Heidtman has

failed to establish the elements of its fraud claim.

5. Compuware argues that, in *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.*, 454

Without such guidance, I will refrain from applying the doctrine to a services contract. As the Sixth Circuit has noted, "respect for the role of the state courts as the principal expositors of state law counsels restraint by the federal court in announcing new state-law principles." *Angelotta v. American Broadcasting Corp.*, 820 F.2d 806, 809 (6th Cir.1987).

Therefore, because the *Neibarger* decision applied the economic loss doctrine in the UCC context, I will not broaden that holding by applying it to a contract for services. *See Cargill v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 (6th Cir.1995) ("Michigan courts apply the doctrine only in situations involving the sale of goods"); *Allmand Associates Inc. v. Hercules Inc.*, 960 F.Supp. 1216, 1223 (E.D.Mich.1997) (refusing to adopt the *Huron* dicta that the economic loss doctrine is applicable to services contracts).

### Heidtman's Fraud Claim Based Solely on Compuware's Contractual Duty

 Under Michigan law, a tort claim cannot be based on the same facts serving as a basis for a breach of contract action. *Hart v. Ludwig*, 347 Mich. 559, 79 N.W.2d 895 (1956). To bring a fraud claim along with a breach of contract action, the plaintiff must establish violation of a duty that exists separately from the contractual obligation. *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.*, 454 Mich. 65, 84, 559 N.W.2d 647 (1997). A careful review

of Heidtman's complaint reveals that the allegations supporting its fraud claim are based solely on Compuware's contractual duties.

Previously, I held that the service agreement and four phase contracts must be read together as one contract. (Doc. 131 at 6–7). The service agreement provided a general outline of the Plus Project, subject to amendments providing more detail about the time and materials obligations. (Doc. 174 at Ex. A). Compuware and Heidtman later agreed to the amendments, as phase agreements, providing further definition for terms in the original agreement. (*Id.* at Ex. B, C, D).

Heidtman's breach of contract claim is based on Compuware's alleged failure to meet both the requirements of the service agreement and four phase agreements. Specifically, Heidtman claims that: 1) Compuware continued to assure Heidtman that the project was proceeding properly although Compuware had knowledge that the Plus Project was failing; 2) Heidtman paid sums for the project in excess of the agreed cost figures; and 3) Compuware repeatedly failed to meet deadlines for completion, mismanaged the technical development of the Plus system, and failed to provide a working computer system. (Doc. 144 at 12–5).

Similarly, Heidtman, in support of its fraud claim, alleges that: 1) Compuware made representations concerning its ability

Mich. 65, 559 N.W.2d 647 (1997), the Supreme Court of Michigan "recognized that the economic loss doctrine under the UCC was simply another name" for the common law rule that a breach of a contractual duty cannot support an action in tort. (Doc. 189 at 22). Compuware points to language in the *Rinaldo's* decision: "In addition to acknowledging this distinction at least as far back as *Hart,* the distinction has more recently been applied to sales contracts under the UCC under the rubric of the 'economic loss doc-

trine.' " *Id.* at 84–85, 559 N.W.2d 647 (*citing Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956)). Therefore, Compuware argues, the economic loss doctrine should be extended to apply to services contracts not governed by the UCC. I disagree. By pointing out that the common law rule and economic loss doctrine serve a similar purpose of prohibiting recovery for intangible economic losses, the Michigan Court did not affirmatively hold that such doctrines are interchangeable.

to install a working computer system prior to the formation of the service agreement; 2) Compuware concealed from Heidtman, prior to the execution of each phase agreement, that the Plus Project was not meeting its goals in order to induce Heidtman to continue with the contract; 3) Compuware hired personnel with no prior training who made budget projections in excess of the contemplated cost; and 4) Compuware recklessly made false representations in each of the phase agreements. (*Id.* at 26–42).

In *Tempo, Inc. v. Rapid Elec. Sales & Serv. Inc.*, 132 Mich.App. 93, 347 N.W.2d 728 (1984), the Michigan Court of Appeals held that the defendants, in their cross-appeal, were not entitled to bring a fraud action without establishing tortious conduct independent of the breach of contract. The defendants alleged that the plaintiffs failed to pay amounts owed in the contract, thereby asserting a breach of contract. The defendants' fraud claim was based on plaintiffs' representations concerning the contract. Noting that, although the plaintiffs may have made representations with no intention of performing them, the court held that the conduct "merely reflects the bad faith nature of the later breach," and is not sufficient to establish an independent fraud claim. *Id.* at 107, 347 N.W.2d 728. *See also Merchants Publ'g Co. v. Maruka Machinery Corp.*, 800 F.Supp. 1490, 1493 (W.D.Mich.1992) (dismissing fraud claim because "operative allegations in the claims would not arise without the existence of the putative contracts between the parties").

The allegations supporting Heidtman's fraud claim are based solely on Compuware's contractual duties. (Doc. 144 at 26–42). Compuware would not have a duty to disclose that it would not meet the phase agreement projections or budget goals, for example, without the presence of the underlying contract. Because Heidtman has not established tortious conduct independent of the breach of contract, Compuware's motion for summary judgment as to the fraud claim shall be granted.

■■■■■ Heidtman also alleges that Compuware made false representations prior to the signing of the service agreement. The service agreement, however, contains two clauses that nullify any representation not included in the agreement.[6] A fraud claim requires reliance on a misrepresentation, and under Michigan law, such clauses make it unreasonable for a party to rely on a representation not included in the later agreement. *UAW–GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 503, 579 N.W.2d 411 (1998) ("when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself"). Because Heidtman has not alleged fraud to invalidate the service agreement, the alleged representations made prior to the signing of the security agreement do not support a fraud claim.

### Conclusion

For the foregoing reasons, it is hereby

---

**6.** The agreement contains the following clauses: "ENTIRE AGREEMENT: This document and the schedules referred to, as well as any amendments, shall constituted the entire Agreement between the parties and supersede all previous communications, representations, understandings, concurrent or subsequent purchase orders, and agreements, whether oral or written, between the parties or any officer or representative of the parties.... RELIANCE: CLIENT HAS NOT RELIED UPON ANY REPRESENTATIONS OTHER THAN THOSE SET FORTH IN THIS AGREEMENT." (Doc. 174 at Ex. A).

ORDERED THAT Compuware's motion for summary judgment be granted in part and denied in part. (Doc. 168).

So ordered.