**CONVERGENT GROUP CORPORATION, d/b/a SchlumbergerSema, Plaintiff,**

v.

**The COUNTY OF KENT, Defendant.**

**The County of Kent, Plaintiff,**

v.

**Schlumberger Limited and Schlumberger Sema, Defendant.**

**No. 1:02–CV–286.**

United States District Court, W.D. Michigan, Southern Division.

April 29, 2003.

Charles N. Ash, Jr., Varnum, Riddering, Schmidt & Howlett LLP, Grand Rapids, MI, for County of Kent.

Richard A. Gaffin, Miller, Canfield, Paddock & Stone, PLC, Grand Rapids, MI, for Convergent Group Corporation.

Jon G. March, Miller, Johnson, Snell & Cummiskey, PLC (Grand Rapids), Grand Rapids, MI, for Facilitative Mediator.

## OPINION

QUIST, District Judge.

On March 28, 2002, the County of Kent (the "County") filed a complaint against Schlumberger Limited and SchlumbergerSema in Kent County Circuit Court alleging claims for declaratory relief, overbilling, and unjust enrichment. On April 26, 2002, Convergent Group Corporation, d/b/a SchlumbergerSema ("Convergent"), filed its complaint in this case against the County alleging claims for breach of contract and specific performance. On April 29, 2002, SchlumbergerSema and SCHLUMBERGER Limited removed the state court case to this Court, and the removed case was consolidated with this case. Now before the Court are Convergent's motion to dismiss and motion for summary judgment, Convergent's motion to strike the affidavit of Jeffrey Allen, and the County's motion for leave to file an amended complaint. For the reasons set forth below, the Court will grant Convergent's motion to dismiss and motion for summary judgment on Convergent's motion to dismiss and for summary judgment on the County's claims for breach of contract, fraud, and unjust enrichment. However, the Court will allow the County to dispute the charges claimed by Convergent in its termination invoice. The Court will also deny the County's motion to amend and will deny Convergent's motion to strike the affidavit of Jeffrey Allen as moot.

## I. *Facts*

On or about March 31, 2000, the parties entered into an agreement (the "Implementation Agreement"), pursuant to which Convergent agreed to design and implement an integrated, turnkey software program for the County's property tax admin-

istration system ("PTAS").[1] The total fixed contract price for the services to be performed and materials to be provided by Convergent under the Implementation Agreement was $5,484,268. The Implementation Agreement contained a section regarding termination for cause, which states:

> 19. ***Termination:*** If either party shall at any time commit any material breach of any covenant or warranty under this Agreement (other than a breach of Section 10) and (i) shall fail to cure such breach within thirty (30) days of written notice of such breach or (ii) if it is not curable within thirty (30) days of written notice, shall fail to diligently commence to cure it within thirty (30) days of notice, the non-defaulting party may at its option, and in addition to any other remedies to which it is entitled, terminate this Agreement by written notice.

(Implementation Agreement § 19, County Compl. Ex. A.) In addition, the Implementation Agreement gave the County the right to terminate the agreement without cause as follows:

> 19.5 CLIENT has the right to terminate in whole or in part this Agreement without cause subject to (i) thirty (30) days notice, (ii) payment to CONSULTANT for all services rendered to date of termination, and (iii) payment of a demobilization fee not to exceed $250,000. CONSULTANT will cease services within a reasonable time after receipt of notice.[2]

(*Id.* § 19.5.) Convergent and the County also entered into a Support Agreement ("Support Agreement"), effective as of October 1, 2000, pursuant to which Convergent agreed to provide the County ongoing maintenance, consulting services, and technical support after the software program was completed and fully implemented pursuant to the Implementation Agreement. The Support Agreement contained a termination for cause provision similar to the above-quoted termination provision of the Implementation Agreement. (Support Agreement § 9.2, County Compl. Ex. B.)

Convergent's primary responsibilities under the Implementation Agreement included coordinating and overseeing the installation of property tax software developed by ASIX, Inc. ("ASIX"), called "Ascend," and facilitating the conversion of data from the County's existing PTAS to Ascend. In connection with its obligations under the Implementation Agreement, Convergent entered into a subcontract with ASIX, which addressed the scope of ASIX's work on the project. The scope of the work under the Implementation Agreement was divided into ten separate tasks, with some tasks being divided into separate sub-tasks. (Implementation Agreement App. A.) Responsibility for the various project tasks and sub-tasks was allocated among Convergent, ASIX, and the County. (*Id.*) The services portion of the contract amount was allocated between services associated with "deliverable products" and services not associated with "deliverable products." (*Id.* App. C at C–1, C–2.) Services not related to "deliverable products" were billed each month based upon a fixed ser-

---

**1.** The agreement indicates that the parties were Convergent and the County. Although both parties referred to Convergent as SchlumbergerSema throughout their contractual relationship, the Court will refer to Plaintiff as Convergent throughout this Opinion.

**2.** The Implementation Agreement identified the County as "CLIENT" and Convergent as "CONSULTANT".

vices fee. Services related to "deliverable products" were billed based upon "Billing Milestones" identified in the agreement. (*Id.* at C–2.) Payment of invoices for "Billing Milestones" having no "CONSULTANT Deliverable" was due the month following completion of the "Billing Milestone," while payment of invoices for "Billing Milestones" having a "CONSULTANT Deliverable" was due the month following the "Acceptance Date" for the deliverable, as defined by the agreement. (*Id.*) Between March 31, 2000, and October 31, 2001, Convergent submitted various Billing Milestone Approval Agreements to the County for its approval in connection with the delivery of certain deliverables. (Darling Decl. Ex. A, Convergent's Br. Supp. Mot. Dismiss Ex. 1.) The County either accepted or did not reject the deliverables completed and delivered by Convergent. (*Id.* ¶ 8.)

Shortly after the parties entered into the Implementation Agreement, a dispute arose regarding Convergent's obligations. (Allen Aff. ¶ 11, County's Br. Opp'n Ex. B.)[3] The County's complaint was that Convergent refused to provide specific modifications to the Ascend program, such as an "assessor's workbook" for use by local property tax assessors. (*Id.*) When the County threatened to terminate the agreements in August 2000, Convergent agreed to enter into an amended Implementation Agreement. Pursuant to the November 2002 amendment, Convergent agreed to provide the modifications demanded by the County, and the County agreed to accept responsibility for "data conversion" tasks. (*Id.* ¶¶ 12, 13.)

By early 2001, the project had fallen several months behind schedule. On April 9, 2001, Troy Darling ("Darling"), Convergent's project manager, notified the County that the project was approximately three months behind as a result of "the lack of Subject Matter Expert (SME) participation in the Data Conversion, Ascend Configuration and Ascend Extension Design activities," which was the County's responsibility under the Implementation Agreement. (Mem. from Darling to Boehm and Allen of 4/9/01, at 1, County's Br. Opp'n Ex. G.) Darling charged that "[t]he lack of SME's and the [County's] lack of assuming responsibility to ensure tasked assignments are completed has caused th[e] delay in the project schedule." (*Id.*) Darling further stated that the delay would cause an increase in the cost of the project, which would be determined and/or negotiated when the new schedule was established. (*Id.*)

The status of the project had not improved by the fall of 2001. On September 21, 2001, Darling informed the County that the County's delay in accomplishing data conversion tasks, and associated lack of project management, was preventing Convergent and ASIX from performing their tasks. (Mem. from Darling to Boehm and Allen of 9/21/02, at 1, County's Br. Opp'n Ex. H.) In his memorandum, Darling cited two reasons for the delay: (1) the lack of understanding of the detailed activities required to complete the data conversion; and (2) lack of personnel assigned by the County to complete data conversion tasks. (*Id.* at 2.) Darling suggested that to reme-

---

**3.** The County relies extensively upon the affidavit of Jeffrey Allen in its brief in opposition to Convergent's motion. Although the County cites to Allen's affidavit in general, it fails to cite the specific paragraph of the affidavit supporting each assertion of fact in its brief. As a result, the Court was left to comb the affidavit to determine which paragraphs supported the County's specific factual allegations. While this was not an overwhelming task, the better practice is for the party to cite its evidence with enough specificity to enable the Court to focus in on the evidence.

dy the situation, the County should conduct a detailed planning session with ASIX to ascertain the required activities for the conversion and also that the County should follow Convergent's recommendation to increase its SME staff size to eight employees. (*Id.*) He also noted the forecasted twenty-month delay of the completion date of the project, indicated that additional compensation would be required for Convergent and ASIX to assist the County in performing its data conversion responsibilities, and offered two change order options for additional project management services by Convergent. (*Id.* at 2–4.) The County responded to Darling's comments in a memorandum dated September 28, 2001, written by David Boehm ("Boehm"). Boehm conceded the delay in data conversion but questioned why the delay of that task would significantly affect the other tasks to be performed by Convergent. (Mem. from Boehm to Darling of 9/28/01 at 1–2, County's Br. Opp'n Ex. N.) Boehm also stated that the County would consider adding eight or more people to the data conversion staff in order to reduce the delay, but that it was unlikely the County would consider retaining an outside consultant for data conversion and even less likely that the County would contract with Convergent for ·such services. (*Id.* at 2.)

On October 30, 2001, Convergent responded to the County's prior request for contract closure pricing based upon two scenarios: (1) termination without cause by the County, effective immediately; and (2) termination without cause by the County, effective December 31, 2001. (Letter from Gay to Delabbio of 10/30/01, County's Br. Opp'n Ex. L.) Convergent estimated that the contract amount would be reduced by approximately $734,000 based upon immediate termination and by approximately $764,000 based upon a December 31, 2001, termination. (*Id.*) Convergent concluded by "request[ing] that the County ... pro-

vide its written termination notice, including preferred option. to proceed, as soon as possible," and stated that upon receipt of the termination notice, Convergent would "prepare the final contract closure invoice and documentation." (*Id.*) The following day, the County informed Convergent that it had reached a decision to terminate the agreements with Convergent. The County stated:

> The outcome of our evaluation and response to your letter dated October 30, 2001, is to use the provisions within our Agreement with [Convergent] and to terminate the Agreement (Contract Number CVG20000025S) in whole. Kent County requests that SchlumbergerSema cease services within 3 business days after receipt of this letter, which date shall be November 5, 2001.

(Letter from Delabbio to Gay of 10/31/01, County's Br. Opp'n Ex. K.)

Following its receipt of the County's termination notice, Convergent sent the County a termination invoice in the amount of $1,398,395.00, which included a $250,000 demobilization fee. (Letter from Gay to Delabbio of 11/14/01, County's Br. Opp'n Ex. O.) In connection with the termination, Convergent's counsel notified the County's counsel that, although the County did not specifically reference the termination provision of Section 19.5 of the Implementation Agreement in its termination notice, Convergent assumed that the County was relying on that provision. (Letter from Ventrell to Lockhart of 11/14/01, County's Br. Opp'n Ex. P.) Convergent's counsel also informed the County's counsel that the remaining deliverables would be provided to the County in their current state of completion upon receipt of payment from the County. (*Id.*) When the County demanded to examine the deliverables, Convergent delivered a box of documents and two CD discs to the

County in December 2001. After reviewing those items, the County objected to the amount claimed by Convergent, but it did not assert that Convergent was not entitled to a termination fee. (Letter from Delabbio to Gay of 12/21/01, County's Br. Opp'n Ex. Q.) The County later determined that Convergent was not entitled to further payment based upon its review of project budget records furnished by Convergent. (Mem. from Boehm to Delabbio of 2/1/02, at 3, County's Br. Opp'n Ex. F.) This suit followed after the parties' contract settlement discussions failed.

## II. *Discussion*

### A. Motion to Dismiss And for Summary Judgment

In its motion to dismiss and for summary judgment, Convergent contends that the County's claims based upon breach of contract and/or warranty are barred by the County's failure to provide Convergent with notice of the alleged breach and to allow Convergent thirty days to cure the breach as required by Section 19 of the Implementation Agreement. In addition, Convergent contends that the County's tort claim based upon false representations of material fact by Convergent to the County is not independent of the county's contract claim and is therefore barred by Michigan's economic loss doctrine. Finally, Convergent argues that the County's unjust enrichment claim must be dismissed because there is an express contract between the parties which governs the County's unjust enrichment claim based upon the alleged overbilling by Convergent.

### 1. Motion Standards

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. 2A James W. Moore, *Moore's Federal Practice*, ¶ 12.34[1][b] (3d ed.1997). The Court need not, however, accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## 2. Contract/Warranty Claims

In Count II of its complaint, captioned "Overbilling," the County alleges that Convergent committed material breaches of the Implementation Agreement and the Support Agreement, including billing the County for work not performed and performing work that did not conform to the requirements specified in the agreements. (County's Compl. ¶¶ 16, 34–36.) These allegations also form the basis of at least part of Count I of the County's Complaint, captioned "Declaratory Relief," which alleges that Convergent owes the County "hundreds of thousands of dollars in reimbursements for work that was not completed, but for which [the] County paid." (County's Compl. ¶ 25.) Convergent contends that the County's claims for breach of contract/warranty are barred because the County failed to provide Convergent written notice of the alleged breaches and thirty days to cure the breaches (or thirty days to commence cure of the breaches if they were not curable within thirty days) as required by Section 19 of the Implementation Agreement and by Section 2–607(3)(a) of the Uniform Commercial Code ("UCC"), M.C.L. § 440.2607(3)(a). Convergent points out that the County did not attempt to utilize the notice and cure provisions of Section 19 to terminate the agreements, but rather sought to terminate the agreements for convenience pursuant to Section 19.5 by paying Convergent a termination fee.

The County does not dispute that it did not give Convergent written notice of any breach of the agreements or that it did not give Convergent thirty days to cure any alleged breaches before terminating the agreements. However, the County cites several reasons why it was not required to comply with Section 19 prior to terminating the agreements, even if Convergent was in breach. The County contends that it was not required to comply with Section 19 because: (1) Convergent's statements and conduct prior to termination amounted to an anticipatory repudiation of the agreements; (2) Convergent waived its right to notice of any breach prior to termination of the agreements; (3) the notice and cure procedure under Section 19 was merely optional and the County was not required to utilized that procedure prior to termination; (4) a question of fact remains for the jury regarding whether the UCC applies to the agreements at issue; and (5) the County gave adequate notice under the UCC. The Court concludes none of these bases is sufficient to excuse the County from complying with Section 19.

 The County first contends that it was not required to comply with Section 19 because Convergent anticipatorily repudiated its obligations under the agreements prior to the date the County sought to terminate the agreements. The doctrine of repudiation or anticipatory breach provides that where, prior to the time for performance, a party to a contract unequivocally declares his intention not to perform, the other party has the option of either suing immediately for the breach or waiting until the time of performance. *Stoddard v. Mfrs. Nat'l Bank of Grand Rapids,* 234 Mich.App. 140, 163, 593 N.W.2d 630, 640 (1999). "In determining whether an anticipatory breach has occurred, it is the party's intention manifested by acts and words that is controlling, and not any secret intention that may be held." *Paul v. Bogle,* 193 Mich.App. 479, 493, 484 N.W.2d 728, 735 (1992). " '[A] party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform.' " *Id.* at 494, 484 N.W.2d at 735

(quoting Restatement (Second) of Contracts § 250 (1981)). However, "an offer to perform made in accordance with the promisor's interpretation of the contract, if made in good faith although it may be erroneous, is not such a clear refusal to perform as to constitute an anticipatory breach." *Walker v. Shasta Minerals & Chem. Co.*, 352 F.2d 634, 638 (10th Cir. 1965) (citing *Kimel v. Mo. State Life Ins. Co.*, 71 F.2d 921 (10th Cir.)).

The County argues that Convergent anticipatorily repudiated the agreements in April of 2001 and again in October of 2001 when Convergent demanded more money to complete its performance under the agreements. The evidence cited by the County, however, does not show an unequivocal intent by Convergent not to perform. In his April 23, 2001, memorandum to David Boehm and Jeff Allen, Darling addressed the delay in data conversion caused by the County's lack of project management and commitment of the proper personnel to the data conversion process, and indicated that the delay would cause an increase in the cost of the project. (Mem. from Darling to Boehm & Allen of 4/23/01.) Nothing in Darling's memorandum indicates that Convergent did not intend to perform. Similarly, Darling's September 21, 2003, memorandum to David Boehm and Jeff Allen addressed the impact the delay in the data conversion process by the County was having on Convergent's and ASIX's work under the agreements, suggested steps the County should take to remedy the situation, and stated that Convergent would provide the County further assistance in performing the County's obligations with additional compensation. (Mem. from Darling to Boehm & Allen of 9/21/01, at 1–2.) Darling wrote:

> [Convergent] and ASIX have performed all of their contractual commitments and are assisting Kent County in performing its commitments in an effort ensure project success. The financial structure of the prime agreement prevents [Convergent] and ASIX from further assisting Kent County in performing its responsible tasks without additional financial compensation.

(*Id.* at 2.) Darling also noted that given the delay, all Convergent and ASIX tasks, except for those affected by data conversion, would be completed by December 20, 2001. Finally, the October 12, 2001, letter from Darling and Andrew Gay, Convergent's Executive Program Manager, to County Administrator, Daryl Delabbio, repeated Darling's prior concerns about the impact of the data conversion delay upon the remainder of the project and requested the County's "assistance in finalizing an acceptable, fair change order option to bring this project to a timely and successful completion." (Letter from Darling and Gay to Delabbio of 10/12/01, County's Br. Opp'n Ex. I.) The letter also stated:

> [Convergent] and its subcontractor are committed to successful completion of the Kent county PTAS project. We will meet all contractual obligations to perform our scope of work; however, we cannot continue to provide services that are not funded by the County of Kent, Michigan. We look forward to meeting with you and jointly ensuring a successful project completion.

(*Id.* at 2.) Thus, at all times, Convergent evinced an intent to perform its obligations, even though it asserted that it was entitled to additional money for performing the County's obligations. Moreover, the evidence shows that the County did not consider that Convergent had repudiated the agreements. This is demonstrated by the facts that the County continued to operate as though the agreements were in effect and that, in conveying its decision to

terminate the agreements, the County referenced the provisions of the agreement rather than any anticipatory repudiation by Convergent.[4]

■ The County next argues that Convergent waived any right to notice that it may have had under the agreements because the County requested different termination scenarios, including an immediate termination, and Convergent responded without mentioning or demanding thirty days notice. This argument must be rejected, because while it is true that Convergent knew the County was considering terminating the agreements, the only termination referenced by the County was a termination for convenience, not a termination for cause. Since the County never notified Convergent of an intent to terminate for cause, Convergent had no reason to assert, and therefore could not have waived, its right to notice and the opportunity to cure under Section 19. *People v. Carines*, 460 Mich. 750, 763 n. 7, 597 N.W.2d 130, 138 n. 7 (1999) (noting that waiver has been defined as the intentional relinquishment of a known right) (quoting *United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)).

■ Next, the County contends that it was not obligated to use the termination provision regarding material breach, because the language of that provision indicates that the notice and cure procedure was merely optional and cumulative to any other remedy the County was entitled to pursue. The County contends that notice and cure is optional because Section 19 states that the nonbreaching party *"may at its option, and in addition to any other remedies to which it is entitled, terminate this Agreement by written notice."* (Implementation Agreement § 19 (italics added).) This argument focuses only upon select language and misconstrues the true import of Section 19, which requires, as conditions precedent to the County's termination of the Implementation Agreement or the County's exercise of any other right or remedy provided by law, that: (1) Convergent commit a material breach of a covenant or warranty under the agreement; (2) the County provide notice of the breach to Convergent; and (3) Convergent fail to cure the breach within thirty days of the notice (or commence to cure within thirty days if the breach is not curable within that time). Read in its entirety, Section 19 makes clear that the County would be entitled to terminate or to exercise any other remedy provided by law only after the specified conditions are met. In this regard, *Short v. Hollingsworth*, 291 Mich. 271, 289 N.W. 158 (1939), is not controlling, or even necessarily applicable, because the issue here is not whether the contractual remedy is exclusive (which it is not), but instead whether the County was entitled to exercise any of its available remedies (whether or not identified in the agreement) for material breach without utilizing the explicit notice and cure procedure.

■ Under Michigan law, where one party to a contract commits a material breach, the nonbreaching party is entitled

---

4. The County also asserts that Convergent had no right to demand more money under the Implementation Agreement because the contract price was fixed. However, under the Implementation Agreement, Convergent had the right to seek additional compensation through a change order "[i]n the event that the County extend[ed] the schedule due to data conversion issues, business strategy changes, increased scope of work, etc." (Implementation Agreement App. F at F–2.) Moreover, even if Convergent did not have a right to seek additional compensation, Convergent's request was based upon a good faith interpretation of the agreement.

to terminate the contract. *Lynder v. S.S. Kresge Co.*, 329 Mich. 359, 369–70, 45 N.W.2d 319, 325 (1951). The parties may modify this rule by conditioning the right to terminate for a material breach upon notice and the opportunity to cure. *Cf. Lichnovsky v. Ziebart Int'l Corp.*, 414 Mich. 228, 236–37, 324 N.W.2d 732, 737 (1982) (noting that the inclusion of the right to terminate for cause only upon notice of the breach and an opportunity to remedy the default within thirty days precluded the licensor's construction of a right to terminate at will). In *Needham v. Candie's, Inc.*, No. 01 Civ.7184 LTS FM, 2002 WL 1896892 (S.D.N.Y. Aug.16, 2002), the court held that under New York law, the plaintiff's failure to give the defendant notice of the alleged breach and an opportunity to cure precluded the plaintiff's claim for damages. *Id.* at *3–4. The plaintiff in that case was employed by the defendant under a written employment agreement which provided that the plaintiff had the right to terminate his employment at any time for "Good Reason," provided that he gave the defendant prior written notice of the basis for the proposed termination and a reasonable opportunity to cure. *Id.* at *1. Several months after the plaintiff began his employment, the defendant informed the plaintiff that the defendant was dissatisfied with the plaintiff's performance. *Id.* The defendant offered the plaintiff a different position with reduced job responsibilities and a reduced salary. *Id.* Subsequently, the plaintiff notified the defendant that he had decided to decline the offer of the new position and was terminating his employment for "Good Reason." The plaintiff asserted that the proposed new position constituted "Good Cause" because it was a material modification and reduction of his duties. The plaintiff's letter demanded severance benefits as provided in the agreement but did not refer to the cure provision in the contract. *Id.* at *2. The court stated, "Parties must adhere to contractually-secured cure provisions regarding contract termination when the cause for the termination is 'the very situation to which the cure provision was intended to apply.'" *Id.* at *3 (quoting *Rebh v. Lake George Ventures, Inc.*, 223 A.D.2d 986, 987, 636 N.Y.S.2d 504, 505 (3d Dep't 1996)). The court held that the plaintiff's claim for breach of contract was barred because he failed to comply with the contractual requirements of notice to the defendant an a reasonable opportunity to cure. *Id.* at *3, 5. Similarly, in this case, the County's failure to comply with the notice and cure requirements under the agreements precludes the County from maintaining its breach of contract claim.[5]

The County's final arguments are concerned with whether the UCC applies to this case and whether the County gave adequate notice under the UCC. Because both agreements contain a notice and cure requirement, and the Court has already determined that the County failed to give Convergent notice and an opportunity to cure, the Court need not reach these issues, at least at this juncture.

 In sum, Convergent is entitled to summary judgment on the County's breach of contract claim based upon the County's failure to comply with Section 19 of the Implementation Agreement and

---

**5.** The County also claims that Convergent breached the agreement by failing to provide status reports and that Jeff Allen notified Darling of such breach verbally and by email dated August 22, 2001. (Allen Aff. ¶ 23.) It appears that Convergent had not provided status reports prior to that time based upon an agreement that such reports would not be required due to the extensive amount of time that Darling would be present in Grand Rapids. (Darling 12/20/02 Aff. ¶ 9.) Nonetheless, Convergent provided a written status report within two business days of Allen's August 22, 2001, email. (*Id.* ¶ 10.)

Section 9.2 of the Support Agreement. However, the County is not precluded from disputing the amounts sought in Convergent's termination invoice on the basis that the work covered by the invoice was not performed or from disputing the basis for the demobilization fee.

### 3. Fraud Claim

■ Count II of the County's complaint alleges that in addition to committing material breaches of the agreements, Convergent made false representations of material fact to the County regarding its performance of its contractual duties, including the scope and nature of the work completed and the amounts owing for that work. Convergent contends that this claim, which essentially alleges that Convergent failed to comply with the parties' agreements, is barred by Michigan's economic loss doctrine. The Court agrees that the fraud claim is barred, either by the economic loss doctrine or its precursor-the rule that a tort action may not be maintained where a contractual agreement exists, unless the tort action is based upon a duty separate and distinct from the contractual obligation.

■ The Michigan Supreme Court first adopted and applied the rule of law known as the "economic loss doctrine" in *Neibarger v. Universal Cooperatives, Inc.,* 439 Mich. 512, 486 N.W.2d 612 (1992). The economic loss doctrine is based upon the notion that contract law and tort law serve two different purposes:

> The economic loss doctrine, simply stated, provides that " '[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses.' " This doctrine hinges on a distinction drawn between transactions involving the sale

of goods for commercial purposes where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by resort to the law of torts.

*Id.* at 520–21, 486 N.W.2d at 615 (quoting *Kershaw Co. Bd. of Educ. v. U.S. Gypsum Co.,* 302 S.C. 390, 393, 396 S.E.2d 369, 371 (1990)) (footnotes omitted). Where a plaintiff seeks to recover only for economic injuries caused by a defective product purchased for commercial purposes, contract principles, as supplied by the UCC, provide the exclusive remedy for such a claim. *Id.* at 527–28, 486 N.W.2d at 618; *see also Snyder v. Boston Whaler, Inc.,* 892 F.Supp. 955, 960 (W.D.Mich.1994). Although the tort claim in *Neibarger* was based upon negligence and products liability, courts have applied the doctrine to other types of torts, including fraud and misrepresentation. *See Imaging Fin. Servs., Inc. v. Eastman Kodak Co.,* No. 97–1930, 1999 WL 115473, at *3 (6th Cir. Feb.9, 1999); *AGA Gas, Inc. v. Wohlert Corp.,* No. 5:98–CV–155, 2000 WL 1478466, at *3–4 (W.D.Mich. July 21, 2000). However, the Michigan Court of Appeals has recognized an exception to the economic loss doctrine for the intentional tort of fraudulent inducement. In *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 532 N.W.2d 541 (1995), the court stated:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely-which normally would constitute grounds for invoking the economic loss doctrine-but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation by the dis-

honest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

*Id.* at 372–73, 532 N.W.2d at 545.

To the extent the economic loss doctrine is applicable to the agreements at issue, the fraud claim would be barred because it simply alleges economic injury based upon Convergent's failure to comply with its contractual obligations. Specifically, the County alleges that Convergent made false representations of material fact regarding the performance of its contractual obligations, including representations concerning the scope and nature of certain work completed and the amounts owing for that work. (Compl.¶ 29.) In other words, the County asserts that it paid for something it did not receive. Thus, the claim is based entirely upon contractual obligations, not upon accident or personal injury. *See Snyder*, 892 F.Supp. at 960.

Because the Court has not determined whether the Implementation Agreement is an agreement for the sale of goods subject to the UCC, there remains a question regarding whether the economic loss doctrine applies to that agreement. The *Neibarger* court adopted the economic loss doctrine specifically in the context of contracts for the sale of goods governed by the UCC. Some courts, including the Sixth Circuit, have held that the doctrine, as adopted in *Neibarger,* applies only to the sale of goods. *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.,* 71 F.3d 545, 550 (6th Cir.1995) (stating that the economic loss "doctrine is associated with 'transactions in goods,' and not with transactions in services" (citations omitted)); *Allmand Assocs., Inc. v. Hercules, Inc.,* 960 F.Supp. 1216, 1223 (E.D.Mich.1997) (same). On the other hand, the Michigan Court of

Appeals has stated that "the doctrine is not limited to the UCC." *Huron Tool & Eng'g Co.,* 209 Mich.App. at 374, 532 N.W.2d at 546. More recently, in *Rinaldo's Construction Corp. v. Michigan Bell Telephone Co.,* 454 Mich. 65, 559 N.W.2d 647 (1997), the Michigan Supreme Court suggested that the economic loss doctrine was merely an extension of the basic principle set forth in *Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956), that a plaintiff may not maintain a tort action where the facts alleged do not give rise to a legal duty separate and distinct from the contract obligation. *Rinaldo's Constr. Corp.,* 454 Mich. at 83–85, 559 N.W.2d at 657–58. The court stated, "In addition to acknowledging th[e] distinction [between contract and tort] at least as far back as *Hart,* the distinction has more recently been applied to sales contracts under the UCC under the rubric of the 'economic loss doctrine.'" *Id.* at 84–85, 559 N.W.2d at 658. While the court's statements in *Rinaldo's Construction Corp.* may arguably be read as extending the economic loss doctrine to all contracts, at least one court has declined to read that case as supporting the proposition that the *Hart* principle and the economic loss doctrine "are interchangeable." *Heidtman Steel Prods., Inc. v. Compuware Corp.,* 164 F.Supp.2d 931, 938 n. 5 (N.D.Ohio 2001). It is unnecessary for the Court to decide whether the economic loss doctrine also applies to service contracts, however, because the County's fraud claim is based solely upon Convergent's contractual duties and, therefore, is subject to dismissal under *Hart* rule. *See Heidtman Steel Prods., Inc.,* 164 F.Supp.2d at 939–40 (concluding that the plaintiff's allegations of fraud were subject to dismissal because they were based upon the same conduct giving rise to the defendant's alleged

breach of contract).[6]

### 4. Unjust Enrichment Claim

In Count III of its complaint, the County alleges a claim for unjust enrichment based upon Convergent's acceptance of payment from the County for work that Convergent did not perform. Convergent contends that this claim must be dismissed because there is an express contract addressing the subject of the County's claim.

A plaintiff may assert a claim for unjust enrichment by alleging that: (1) the defendant received a benefit from the plaintiff; and (2) an inequity will result because of the defendant's retention of the benefit. *Barber v. SMH (US), Inc.*, 202 Mich.App. 366, 375, 509 N.W.2d 791, 796 (1993). Under those circumstances, the law will imply a contract in order to prevent unjust enrichment. *Id.* "However, a contract will be implied only if there is no express contract covering the same subject matter." *Id.* In this case, it is undisputed that there was an express contract between the parties which governed the timing and amount of payments the County was to make to Convergent. Convergent asserts that the payments it received were required under the agreement, while the County claims that Convergent was not entitled to the payments because Convergent had not performed the work associated with those payments. Thus, whether Convergent was entitled to the payments is an issue that must be resolved with reference to the Implementation Agreement.

The County contends that it is not precluded from maintaining an unjust enrichment claim in addition to a breach of contract claim. That principle is true in some circumstances, but the cases cited by the County do not support an unjust enrichment claim in this case. For example, in *Durant v. ServiceMaster Co.*, 159 F.Supp.2d 977 (E.D.Mich.2001), the court held that the plaintiffs were not precluded from maintaining a claim for unjust enrichment in addition to their breach of contract case. *Id.* at 983. However, the unjust enrichment claim was allowed as an alternative claim because the existence of an express contract had not been established by admission of the defendants or through summary judgment. *Id.* The court cited a footnote from *Graphic Resources Group, Inc. v. Honeybaked Ham Co.*, 51 F.Supp.2d 822 (E.D.Mich.1999), in which the *Graphic Resources Group* court rejected the defendant's argument that the plaintiff's unjust enrichment claim was precluded in light of the plaintiff's allegation of an express contract between the parties. *Graphic Resources Group*, 51 F.Supp.2d at 828 n. 4. As in *Durant*, the court in *Graphic Resources Group* observed that the plaintiff could maintain the unjust enrichment claim as an alternative theory in the event that the plaintiff failed to establish an express contract. In contrast to *Durant* and *Graphic Resources Group*, in this case, it is undisputed that there was an express agreement between the parties. As the Sixth Circuit has observed, "Where the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover from promissory estoppel and unjust enrichment." *Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 181 (6th Cir.1996) (citing *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 939 (6th Cir.1989)). Thus, there is no need for

---

**6.** The County does not dispute that its fraud claim is barred by the economic loss doctrine, but it argues that the economic loss doctrine does not preclude its fraudulent inducement claim set forth in its proposed amended complaint. The Court will address this issue in its discussion regarding the County's motion to amend.

the County to rely on an unjust enrichment claim. Therefore, this claim will be dismissed.

## B. Motion to Amend

The County has filed a motion to amend its complaint to add a claim for fraud in the inducement. In its proposed amended complaint, the County alleges that "Convergent made numerous material representations about existing facts to Kent County for the purpose of inducing Kent County to enter into the original Implementation and Support Agreements and the Amended Implementation and Support Agreements." (County's Proposed Am. Compl. ¶ 71.) Convergent opposes the motion on several grounds.

Under Rule 15(a) of the Federal Rules of Civil Procedure, once a responsive pleading has been filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). Rule 15(a) also provides that "leave shall be freely given when justice so requires." *Id.* The mandate that "leave shall be freely given" embodies "the principle that cases 'should be tried on their merits rather than the technicalities of the pleadings.'" *Moore v. City of Paducah,* 790 F.2d 557, 559 (6th Cir.1986) (per curiam) (quoting *Tefft v. Seward,* 689 F.2d 637, 639 (6th Cir.1982)). However, a court is not obliged to grant an amendment simply because a motion is made. *See Johnson v. Ventra Group, Inc.,* No. 96–1463, 1997 WL 468332, (6th Cir. Aug.13, 1997) (per curiam). "A motion to amend a complaint should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Crawford v. Roane,* 53 F.3d 750, 753 (6th Cir. 1995); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

The Court concludes that the County's motion should be denied because the County's proposed fraud in the inducement claim would be futile. A proposed amendment is futile if it would not withstand a motion to dismiss. *Ziegler v. IBP Hog Market, Inc.,* 249 F.3d 509, 518 (6th Cir.2001).

The Implementation Agreement contains a merger clause which provides:

> This Agreement and Appendices hereto constitute the entire agreement between the parties as to the Work and shall supercede all proposals or prior agreements, oral or written, including without limitation the redlined agreement executed on March 31, 2000, and all other communications between the parties relating to the Work.

(Implementation Agreement § 28.5.) The Support Agreement contains a similar merger clause.[7] In order to allege a valid claim for fraud in the inducement, a plaintiff must prove not only an intentional misrepresentation, but also reasonable reliance on that misrepresentation. *Dur-Ram Packaging Devices, Ltd. v. Self–Seal Containers, Inc.,* 18 Mich.App. 81, 85, 170 N.W.2d 473, 475 (1969) (listing the elements of a fraud in the inducement claim). Under Michigan law, a merger clause in a

---

7. That provision states, in part:

 This Agreement and the Appendices hereto, the Implementation Agreement, and the ASIX Master Software License and Support Agreement between CLIENT and ASIX dated March 31, 2000, constitute the entire agreement between the parties and shall supercede all proposals or prior agreements, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

 (Support Agreement § 25.)

contract precludes a party from introducing parol evidence to contradict or vary the written agreement. *UAW–GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich.App. 486, 499, 579 N.W.2d 411, 417 (1998). In such a case, parol evidence is admissible to prove fraud in the inducement only where the alleged fraud would invalidate the merger clause itself or where the fraud would invalidate the entire contract, including the merger clause. *Id.* at 503, 579 N.W.2d at 419. The County's proposed amendment does not allege fraud that would invalidate either the merger clause or the entire agreement. Therefore, in light of the merger clauses, any reliance by the County upon the alleged misrepresentations would be unreasonable. *Id.* at 504, 579 N.W.2d at 504–05; *see also Heidtman Steel Prods., Inc.*, 164 F.Supp.2d at 940 ("Because Heidtman has not alleged fraud to invalidate the service agreement, the alleged representations made prior to the signing of the security agreement do not support a fraud claim.").

## C. Motion to Strike Affidavit of Jeffrey Allen

Convergent has filed a motion to strike the affidavit of Jeffrey Allen submitted by the County in response to Convergent's motion to dismiss and for summary judgment on the grounds that Allen lacks personal knowledge on many of the matters set forth in his affidavit and his affidavit contradicts his deposition testimony. The motion as moot because the Court did not rely upon the cited portions of Allen's affidavit in addressing Convergent's motion to dismiss and for summary judgment.

### III. *Conclusion*

For the foregoing reasons, the Court will grant Convergent's motion to dismiss and for summary judgment in part. The County's fraud and unjust enrichment claims will be dismissed. The County's breach of contract claim will be dismissed, except that the County may dispute the amounts sought by Convergent in its termination invoice. In addition, the Court will deny the County's motion to amend and will deny Convergent's motion to strike the affidavit of Jeffrey Allen as moot.

An Order consistent with this Opinion will be entered.

### *ORDER*

In accordance with the Opinion filed this date,

**IT IS HEREBY ORDERED** that Plaintiff, Convergent Group Corporation's, Motion to Dismiss and for Summary Judgment (docket no. 34) is **GRANTED.** Defendant, the County of Kent's, breach of contract, fraud, and unjust enrichment claims are **dismissed.** However, the County will be permitted to dispute the charges in the termination invoice submitted to the County by Convergent Group Corporation.

**IT IS FURTHER ORDERED** that Kent County's Motion for Leave to File Amended Complaint (docket no. 44) is **DENIED.**

**IT IS FURTHER ORDERED** that Convergent Group Corporation's Motion to Strike Affidavit of Jeffrey Allen (docket no. 108) is **DENIED AS MOOT.**