Vermont Gas v. Riser Management, No. S1186-03 CnC (Katz, J., Mar. 8, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

                                                            S1186-03 CnC


VERMONT GAS SYSTEMS

v.

RISER MANAGEMENT SYSTEMS &
LONG DISTANCE PARTNERSHIP


ENTRY


    This small claims court appeal concerns the Economic Loss Rule, issues of negligence, and valuation for the loss of telecommunication

services. Appellant Union-Water is the party responsible for severing appellee's telephone lines as the result of negligent digging on June 4, 2002. This accident effectively shut down appellee Riser[1] for an entire day since its business was long distance service and support for various customers. The lower court found Union-Water liable for "physical" damage resulting from their actions and awarded Riser damages for its loss.

## The New Economy and the Economic Loss Doctrine

Union-Water first raises the Economic Loss Rule as a bar to recovery because Riser does not own the phone lines severed by Union-Water but only leases the use of them, which means that none of Riser's property suffered any physical harm as a result of Union-Water's negligence. Nor were any Riser employees injured as a result of Union-Water's actions. Riser's damage claim comes instead from economic losses: lost business and man-hours expended because of the loss of telephone lines. Union-Water's first argument for appeal is that the Economic Loss Rule should bar Riser's recovery. Under the Economic Loss Rule, plaintiffs may not recover in tort for consequential damages that are strictly economic if there is not an accompanying tort. By arguing the Economic Loss Rule, however, Union-Water is unnecessarily confusing two concepts in tort law. As a bar to tort recovery, the Economic Loss Rule has first and foremost functioned to keep tort law out of commercial or consumer transactions where contract law controls. See, e.g., S. Gardner & M. Sheynes, The Moorman Doctrine Today: A Look at Illinois' Economic-loss Rule, 89 Ill. B.J. 406, 406 (2001) ("The practical application of this

---

[1] Long Distance Partnership is also plaintiff in this case. Due to the unity of their interests and the purposes of this entry, all references to Riser are applicable to Long Distance Partnership.

rule bars consequential damages not necessarily intended by the parties at the time of making the contract, as well as punitive damages, which typically are not recoverable in contract, unless the conduct allegedly in breach can be characterized as an independent tort."); E. Ballinger, Jr. & S. Thumma, The History, Evolution and Implications of Arizona's Economic Loss Rule, 34 Ariz. St. L.J. 491, 492–93 (2001) ("[T]he economic loss rule is one of several principles that have evolved to define the boundaries of both contract and tort and to ensure a proper and vital role for both bodies of law."); T. Yocum & C. Hollis, III, The Economic Loss Rule in Kentucky: Will Contract Law Drown in a Sea of Tort?, 28 N. Ky. L. Rev. 456, 459 (2001) ("[Kentucky's Economic Loss Rule] recognizes a mutual exclusivity between claims sounding in contract and tort, encouraging sophisticated parties entering into contracts to bargain now rather than sue in tort later."); S. Tourek, et al., Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation, 84 Iowa L. Rev.875 (2001) ("The Economic Loss Doctrine is a judicially created doctrine that provides commercial purchasers of goods cannot recover damages that are solely economic losses from manufacturers of those goods under 'tort' theory."). It functions to prevent plaintiffs from using negligence and strict liability to do an end-run around the tighter requirements of contract and warranty law, where parties can predict and shift their risk of loss accordingly. In other words, the Economic Loss Rule is a stabilizing principle to keep the "soft" analysis of policy and duty under tort law away from parties who have had the opportunity to bargain for the risk or who can rely on a set of rules to supply any missing terms in a predictable manner. See, e.g., 9A V.S.A. §§ 2-313–2-316 (U.C.C. warranty law).[2]

---

[2] Historically, the Economic Loss Rule developed as a judicial check on §

Similarly, the major Vermont cases enunciating the Economic Loss Rule have involved parties whose primary relationship was contractual. Springfield Hydroelectric Co. v.Copp, 172 Vt. 311, 314 (2001) ("As our caselaw makes clear, claimants cannot seek, through tort law, to alleviate losses incurred pursuant to a contract."); Gus' Catering v. Menusoft, 171 Vt. 556 (2000) (mem.) (refusing damages for negligence to customer who bought software which was negligently installed); Paquette v. Deere & Co., 168 Vt. 258, 260–64 (1998) (applying the doctrine to a strict liability claim for a defective motor home purchased from defendant manufacturer); Breslauer v. Fayston Sch. Dist., 163 Vt. 416, 421–22 (1995) (denying negligence claim for economic losses for breach of employment contract); see also East River Steamship Corp. v. Transamerica Delaval, 476 U.S. 858, 870–71 (1986) (limiting damages to the cost of the product and not consequentials "[w]hen a product injures only itself.").  In each of these cases, the courts had the separation of contract and tort law as an underlying interest.  In Riser's case, there was no contractual relationship with Union-Water.

The question then becomes whether or not the Economic Loss Rule should apply.  Without a contractual relationship, the Rule has nothing to protect and its application provides no clarity between contract and tort law. If anything, it expands the scope of the Rule by pushing beyond contract/ product liability origins, where there is always a contractual relationship

---

402A strict liability.  Springfield Hydroelectric Co. v.Copp, 172 Vt. 311, 314–15 (2001).  In such situations, a contract was always involved because the defendant was the seller or manufacturer whose connection to the plaintiff was through a sale.  While the Rule has since spread to areas of tort law such as negligence, id., it has in nearly all cases kept this initial and significant connection to contract law.

between the parties, to where the Rule functions as a prerequisite of any tort action. Compare Springfield, 172 Vt. at 314–15 (discussing the function of the Economic Loss Rule and its origins in the rise of strict liability product law); with Heidtman Steel Prods., Inc. v. Compuware Corp., 164 F. Supp. 2d 931, 938–39 (N.D. Ohio 2001) (refusing to apply Michigan's Economic Loss Rule to a computer system because as a service it did not fall under the rule).

What Union-Water is actually arguing when it asserts the Economic Loss Rule is an older principle of negligence law, which requires a physical harm of some kind. 1 D.Dobbs, The Law of Torts 258–59 (2001) ("Other tort rules protect against intangible losses like emotional or financial harm, but negligence alone is often not enough"); cf. Springfield, 172 Vt. at 314 ("The underlying premise of the economic loss rule is that negligence actions are best suited for 'resolving claims involving unanticipated physical injury, particularly those arising out of an accident. Contract principles, on the other hand, are generally more appropriate for determining claims for consequential damage that the parties have. . .'") (quoting Spring Motors Distribs. v. Ford Motor Co., 489 A.2d 660, 672 (N.J. 1985)). Unlike Springfield, this present case has a physical injury that resulted from an accident. Like the plaintiffs in Springfield, however, Riser's claim for injuries is strictly economic loss.

Notwithstanding the economic nature of Riser's injuries, the lower court concluded that the physical accident, the severing of the telephone lines, was enough to trigger negligence because it was really a physical injury against Riser. "The evidence in this case indicates that the product, which [Lightship] sold and Plaintiffs paid for was telephone service. It is not tangible, but it is physical." Riser v. Vt. Gas Sys., No. S0203-03 Cnsc, at 3 (Villa, J., Aug. 29, 2003). While the lower court, Riser, and Union-

Water have crafted metaphors and analogies to support or disprove this metaphysical conceit, we will resist the temptation.[3]  The issue that the lower court raises, however, is quite valid.  As our economy shifts from manufacturing and goods to more ethereal products such as electronic data and information processing, Why should not our tort law continue to compensate businesses for unexpected losses that derive from accidents that simply cannot be contracted away?  Negligence's emphasis on the physical cannot be simply dogma where widgets are compensated while software and databases are ignored.  See M. Colombell, Note, The Legislative Response to the Evolution of Computer Viruses, 8 Rich. J. L & Tech. 1 (2002) (discussing some initial shifts in attitude toward computer damages in tort law).  Caselaw, however, has not progressed to this point and still requires the physical to be tangible for the purposes of tort protection.  See Rockport Pharmacy, Inc. v. Digital Simplistics, Inc., 53 F.3d 195, 198 (8th Cir. 1995) (citing failure of a customized computer system, including hardware and software, which destroyed data, did not fall into "other property" exception to economic loss doctrine); Lucker Manufacturing v. Home Insurance Co., 23 F.3d 808, 819–21 (3d Cir. 1994) (defining tangible within the context of caselaw); D. Perlman, Who Pays

---

[3] We do find the entire situation comparable to the one faced by nineteenth century denizens awakening to their new age of electricity.

> *Between the dynamo in the gallery of machines and the engine-house outside, the break of continuity amounted to abysmal fracture for a historian's objects.  No more relation could he discover between the steam and the electric current than between the Cross and the cathedral.*

H.Adams, The Education of Henry Adams ch. 25, ¶ 4 (1918).

the Price of Computer Software Failure?, 24 Rutgers Computer & Tech. L.J. 383, 395–97 (1998).

There remains still the problem of how Riser, an innocent party, could recover damages caused by an accident completely outside the context of contract. This is precisely what negligence was developed to handle. Merely sweeping this case under the broad skirt of the Economic Loss Rule would simultaneously expand the Rule to a situation devoid of contract considerations yet weaken negligence's purpose of requiring responsible parties to compensate wronged persons for their injuries based on a careful calculus of duty and proximate cause. People Express Air., Inc. v. Consol. Rail Corp., 495 A.2d 107, 111–12 (N.J. 1985); see also Springfield, 172 Vt. at 316 (applying a duty of care analysis to pure economic loss). To bar negligence from this situation would create a paradox, where "the loss of information is recoverable if it is in a tangible folder but not if it is in intangible digital form." Riser, No. S0203-03 Cnsc, at 4. No sound reason supports such a restriction to applying negligence in the present case.

While this represents a step away from a traditional preoccupation with the corporeal in negligence, it is part of a growing acceptance of economic loss as a valid source of damages in negligence. People Express, 495 A.2d at 109–10, 116 (rejecting traditional requirements of physical harm as unfounded in earlier caselaw and unfair to a fairly grounded claim for redress). In reality, it is a recognition that negligence in its complex analysis, rather than arbitrary rule, is the best avenue to resolve claims where an accident is involved. Union-Water's concern that this would open the floodgates to all kinds of lawsuits is checked by the long standing gates of proximate cause and duty of care. See Palsgraf v. Long Island R.R., 162 N.E. 99 (1928) (asserting duty of care and proximate cause to limit a

defendant's liability).

## Duty of Care and Negligence

We therefore come to the question of whether Union-Water had a duty of care toward Riser to avoid cutting the telephone lines. Riser argues that the Vermont dig-safe statutes, 30 V.S.A. §§ 7001–7008, create such a duty as part of negligence per se. To support this claim, however, they do not cite to caselaw from either Vermont or another state that has found such a duty to arise toward a telephone user from these now common statutes. Under Vermont law, negligence per se requires that:

> The statute or regulation must be intended at least in part:
> (a) to protect a class of persons which includes the one whose interest is invaded, and
> (b) to protect the particular interest which is invaded, and
> (c) to protect that interest against the kind of harm which has resulted, and
> (d) to protect that interest against the particular hazard from which the harm results.

Dalmer v. State, 174 Vt. 157, 164 (2002) (adopting the standard from the Restatement (Second) of Torts § 286 (1965)). The purpose of Vermont's Dig-Safe statutes is to protect underground utilities, which as defined in § 7001(9) means the physical "pipe, wire, conduit, or cable located beneath the surface," from damage, which is defined in § 7001(3) as the "weakening or destruction" of these utilities. Notice of digging or damage under these statutes runs only between the public utility system, the owners of the utilities, and the excavator. §§ 7002, 7004, 7005, 7007. Under the penalties in § 7008, there is no mention or compensation for the users or

recipients of utilities to receive compensation. Aside from not even mentioning utility users, the dig-safe statutes do not protect users or consider their losses. Instead, they create a duty between utility owners and excavators to accurately mark and dig for utilities. See, e.g., Crews v. Hollenbach, 751 A.2d 481, 484 (Md. 2000) (noting that a similar statute was created to protect individuals during excavation and the utilities themselves from destruction). We therefore decline to conclude that users are the individuals protected by the statutes. Hence Riser is not eligible to claim negligence per se against Union-Water.

Without negligence per se, Riser's argument for duty becomes a question of foreseeability. Does Union-Water owe a common law duty of care when digging to the users of the utilities affected? Union-Water does not appear to contest this point but prefers to look beyond to the question of proximate causation. Notwithstanding this, we must examine the lower court's implicit conclusion that Union-Water does owe a duty to foreseeable users of the utilities. See Palsgraf, 162 N.E. 99 (beginning the debate in tort theory over duty and proximate cause); see also 1 Dobbs, supra, at §§ 227–230 (discussing the slippery nature of duty analysis and its confusion with proximate cause). Common-law duty of care standards, not created by statute or contract, must arise out of a basis of public policy considerations including foreseeability. Langle v. Kurkul, 146 Vt. 513, 518 (1986); United States v. Carroll Towing, 159 F.2d 169 (2d Cir. 1947); People Express, 495 A.2d at 115–16.

In this case, Riser was the direct user of the severed phone lines. While utility users may not be protected by the dig-safe statutes per se, the statutes do illustrate the dangers and potential damages in excavating near utilities. Indeed, but for ownership, Riser's interests in the phone lines and

their continuing preservation are nearly identical to the owner's. It requires therefore only a small deduction to draw the statutory consequences out a little further to cover the direct users. Utilities by their nature are services for others. Gas, electricity, and telecommunications are not shipped about underground merely for the profit and pleasure of the utility companies, they always serve another user. Excavators such as Union-Water must be aware that negligent digging will not merely affect the physical lines but also the services they carry. It is highly foreseeable that any damage therefore to the physical will be accompanied by damage to the users. Any duty Union-Water had not to harm Lightship's phone lines is therefore extendable to users who will invariable suffer harm as a result of this kind of accident.

But foreseeability alone is not enough to create duty. Langle, 146 Vt. at 519. Beyond foreseeability, a court must look at other public interest considerations:

> These factors include: ". . . the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

Coulter v. Superior Court, 577 P.2d 669, 674 (Cal. 1978) (quoting Rowland v. Christian, 443 P.2d 561, 564 (Cal. 1968)), quoted in Langle 146 Vt. at

519. A legal duty of care requires a determination that there is a public interest in expanding the duty. Langle 146 Vt. at 519. In this case, the legislature chose to limit dig-safe remedies to only owners and excavators. While the dig-safe statutes do not appear to preempt liability in this area, they do suggest an established range that excavators have for a duty of care. To extend this range even a little further to users would create liability in defendants, like Union-Water, far beyond the value of their work. For example, if excavators owed a duty to users, then we can see nothing that would stop them from being liable in a wrongful death suit for negligently cutting power to a hospital which shut off life-support systems to patients (a suit which would hypothetically not have the economic loss problem faced by Riser). Utility work, under this duty, would have an additional level of risk depending solely on the users in the area. Excavators would be liable to a limitless and unknown body of users who could suffer any level of harm. As is the case here where there is no evidence that Union-Water was or could have been aware that Riser depended so heavily on its phone lines or that the accident would cause so much damage.

Even if Union-Water had some way of knowing the potential results of its digging, there is no evidence that it or any other excavator would have behaved more carefully. Liability to users will not make excavators dig more carefully or avoid lines. Statutes already create liability for excavators and are effective motivation to take precautions. Riser cannot say that future telephone users will suffer any less disruption in service if liability for excavators is expanded. In fact, there does not appear to be any social policy reason to expand Union-Water's duty of care in this situation beyond creating a source of recovery for Riser. Such private reasoning, however, cannot compel public tort law to expand. See Langle, 146 Vt. at 520 (refusing to expand duty of care to merely allow plaintiff to recover).

We therefore conclude that Union-Water did not owe Riser a legal duty of care to avoid severing telephone lines.  Since there is no duty of care, there is no reason to address any further issues of proximate cause or damages.

The judgment of the Small Claims Court is reversed.  All claims against defendants are dismissed.

Dated at Burlington, Vermont_____, 2004.